Millard L. Midonick, J.
The problem here is what weight or effect shall, or must, be given in this support proceeding (brought by a mother, just divorced, in behalf of her child of the dissolved marriage, against the father and ex-husband) to a prior adjudication by another court of competent jurisdiction, incidental to a matrimonial decree, providing for support of the child at $15 per week as fixed in a separation agreement Í
*764 This problem assumes its most destructive potential when a prior adjudication, usually migratory, is based upon a separation agreement between unhappy spouses, without any contested or true showing as to the needs of the minor children or the actual means of the father, and the mother is so anxious to end her marriage that she ‘ ‘ sells out ’ ’ her children for a matrimonial decree inequitably failing to provide for the children adequately.
This hearing was held before this court eight months after a jointly obtained and uncontested Mexican divorce decree (State of Chihuahua). The Mexican court adopted the separation agreement of the parties providing $15 weekly support for this young child.
Since the Mexican divorce decree, no changes of the child’s or the father’s circumstances have occurred. The mother here petitioning is also in the same condition and posture, in the sense that postdivorce findings usually articulate such circumstances. Nevertheless, I have ordered a 50% increase in the support of this minor child because of the original inequity of the provision for this boy in the separation agreement which was carried over into the Mexican divorce decree without inquiry or deliberation. The inequity consisted of the need of the child for more and the ability of the father to pay more, before, during and since the divorce decree.
The change of circumstances, here articulated for the first time in any judicial opinion, is simply that of the mother then constrained by her matrimonial dispute; now, eight months later, free to litigate for the first time on its own merits the issue of support of her minor child, unsubordinated to the vagaries of her personal need to consent to a matrimonial disposition carrying child support as a mere incidental backwash mishandled by her therein.
While this fundamental type of changed circumstances is here articulated for the first time, a careful analysis of the holdings and views of the Court of Appeals of New York, and of the Appellate Divisions of the Supreme Court of New York, and indeed of the Supreme Court of the United States, encourages the conclusion that such a change of circumstances is not only a permissible basis for a modification of child support provisions in a prior marital decree, but indeed is mandated.
In 1952 the Court of Appeals in Langerman v. Langerman (303 N. Y. 465) so decided, although the courts of this State have since been able to find the more conventional changes in needs of the children (cf., e.g., Langerman v. Langerman, 203 Misc. 230) or increased earnings by the father.
*765 In the Langerman case, supra, the Court of Appeals held that, although the Supreme Court of New York had no jurisdiction over the subject matter, nevertheless our predecessor court, the Domestic Relations Court of the City of New York, had such power. There a valid migratory Nevada divorce decree granted three years before, limited each of two children now living with their mother in New York, children of an already wealthy father earning about $40,000 annually after income taxes, to $25 per week per child, plus medical expenses. The Court of Appeals affirmed the dismissal of a complaint brought in the Supreme Court of Neiv York on behalf of the two children only, praying for adequate additional support, the court expressly basing its holding on the ground (p. 468) that “ No new circumstances or change of conditions are alleged in the complaint ”. The Court of Appeals, in this historically significant opinion, nevertheless gave leave to the plaintiff children, despite these unchanged circumstances in the theretofore used sense of this phrase, to proceed in the Domestic Relations Court rather than in the Supreme Court of New York, because the Supreme Court then had no statutory or inherent jurisdiction for child support except as incidental to a decree of separation, divorce or annulment. Section 137 of the then effective Domestic Relations Court Act was thus interpreted as permitting the Domestic Relations Court to modify the child support (i.e., incidental) features of the valid migratory Nevada decree obtained by this mother, under statutory language then reading: “ If the marriage relationship shall have been terminated by final decree of the supreme court of the state of New York or by judgment of any other court of competent jurisdiction, when valid in the state of New York, a petition may be filed or an order for support made or enforced in the family court [then a division of the Domestic Relations Court of the City of New York; now called the Support and Conciliation Term of the Family Court of the State of New York] only for the benefit of a child of such marriage.” (N. Y. City Dom. Rel. Ct. Act, § 137, subd. 1; superseded on Sept. 1, 1962 by similar provisions of Family Ct. Act, § 461, below. To similar effect was Children’s Ct. Act, § 33-i, also superseded by Family Ct. Act, § 461.)
Except in separation, divorce, annulment, custody or visitation controversies, where child support is incidentally within the province of the Supreme Court by statute, the Family Court still has 11 exclusive original jurisdiction over support proceedings ” (Family Ct. Act, § 411) and “ The father of a child is chargeable with the support of his child and, if possessed of sufficient means or able to earn such means, may be required *766 to pay for Ms support a fair and reasonable sum according to Ms means, as the court may determine.” (Family Ct. Act, § 413; see, also, Domestic Relations Law, § 240; Report of Joint Legislative Committee on Matrimonial and Family Laws, N. Y. Legis. Doc., 1962, No. 314, pp. 309, 310.)
Carrying forward in the new Family Court the Langerman (supra) power, to modify extra-State matrimonial decrees providing for support of children alone, subject to express conditions, is section 461 of the Family Court Act effective since September 1, 1962:
“ (a) A separation agreement, a decree of separation, and a final decree or judgment terminating a marriage relationship does not eliminate or diminish either parent’s duty to support a child of the marriage under sections four hundred thirteen and four hundred fourteen of this article. In the absence of an order of the supreme court or of another court of competent jurisdiction requiring support of the child, the family court may entertain a petition and make an order for its support.
“ (b) If an order of the supreme court or of another court of competent jurisdiction requires support of the child, the family court may
“ (i) entertain an application to enforce the order requiring support; or
“ (ii) entertain an application to modify such order on the ground that changed circumstances requires such modification,
unless the order of the supreme court provides that the supreme court retains exclusive jurisdiction to enforce or modify the order.” (Italics supplied.)
But these express conditions, as to change of circumstances before a support decree can be modified, had long been known to New York law in the full faith and credit given to jurisdictionally valid decrees of sister States, and in the comity accorded to such decrees of foreign States not of the Union. Nevertheless, the Langerman doctrine, unanimously handed down by the Court of Appeals in 1952, advised the plaintiff children to petition in the Domestic Relations Court for an upward modification for their support despite the fact that “No new circumstances or change of conditions are alleged in the complaint” (303 N. Y. 465, 468, supra) after the Nevada decree dissolving the marriage three years before, evidently because an inequity was alleged as to the minor children under the circumstances as they had always existed from the moment of the Nevada decree limiting them to $25 weekly. The Court of Appeals cited the Nevada *767 statute which provided that “in actions for divorce the court may * * * at the final hearing or at any time thereafter during the minority of any of the children of the marriage, make such order for the custody, care, education, maintenance and support of such minor children as may seem necessary or proper, and may at any time modify or vacate the same.” (Italics supplied.) It is noteworthy that nothing in the Nevada statute expressly conditions such modification on changes of circumstances, but judicial modifications for no reason at all would obviously constitute an abuse and reversible error anywhere. The Court of Appeals having expressly noted that “No new circumstances or change of conditions are alleged” (p. 468), goes on to hold that the courts of New York “ have the power to act in like fashion ”, having the modification powers of Nevada courts (p. 473). “In other words, the full faith and credit clause of the Federal Constitution does not preclude a petition for additional support in the Domestic Relations Court. Congress pursuant to the authority conferred upon it by section 1 of article IV of the Federal Constitution has provided that judgments ‘ shall have the same full faith and credit in every court within the United States * * * as they have by law or usage in the courts of such State * * * from which they are taken. ’ (* * * U. S. Code, tit. 28, § 1738.) * * * Thus in Halvey v. Halvey [330 U. S. 610, 614], the Supreme Court of the United States has epitomized the doctrine by saying: ‘ So far as the Full Faith and Credit Clause is concerned, what Florida could do in modifying the decree, New York may do.’” (303 N. Y. 465, 473 174.)
The Court of Appeals so decided in 1952 with full awareness of the strictures of the full faith and credit clause (U. S. Const., art. IV, § 1) as interpreted by the majority opinion in Yarborough v. Yarborough (290 U. S. 202 [1933]), which was cited by counsel (303 N. Y. 465, 467). The Supreme Court of the United States itself has severely limited to its unique facts and has cast much doubt upon the majority holding in Yarborough; and indeed the Justices of that court have frequently invoked the thoughtful and considered minority opinion of Mr. Justice (later Chief Justice) Stoke, concurred in by Mr. Justice Cakdozo. Mr. Justice Stoke himself observed that in absolving a father from all further support for the life of his 14-year-old daughter, by approving a small lump-sum settlement by agreement made in the course of a contested divorce proceeding in the native State of the parties, the Georgia courts have precluded even themselves from altering their own decree. He stated (p. 222) that “it comes as a surprise that any state, merely *768 because it has made some provision for the support of a child, should, either by statute or judicial decree, so tie its own hands as to foreclose all future inquiry into the duty of maintenance however affected by changed conditions ” and that (p. 222, n. 17) “ Georgia seems to be the only state to do so. II Vernier, Family Laws, 196 ff. A similar attempt by the courts of another state has been held null and void and subject to collateral attack. See Walder v. Walder, 159 La. 231; 105 So. 300.”
As so concisely put in Note, Ford v. Ford: Full Faith and Credit to Child Custody Decrees? (73 Yale L. J. 134,144 [1963] at footnote 58): “ The idea that the full faith and credit clause is not always an absolute mandate was first fully articulated in an oft-cited opinion by Mr. Justice Stone in Yarborough v. Yarborough, 290 U. S. 202, 213 (1933) (dissenting opinion). In dissenting from a majority holding that the clause required South Carolina to give credit to a child support provision of a Georgia divorce decree, Stone advanced the proposition that ‘ there are many judgments * * * though valid in the state where rendered, to which the full faith and credit clause gives no force elsewhere. * * * There comes a point beyond which the imposition of the will of one state beyond its own borders involves a forbidden infringement of some legitimate interest of the other. ’ Id. at 214-215. Justice Stone subsequently became the leading spokesman for the Court on full faith and credit, and the balancing test became a standard ingredient of, and framework for, analyses of problems arising under the clause [citing many majority opinions written by Chief Justice Stone]. See Cheatham, Stone on Conflict of Laivs, 46 Colum. L. Rev. 719 (1946).”
The Yarborough case, unlike Langerman (supra) and the one at bar, involved a man always and still residing* in Georgia, the State of the original decree. As Mr. Justice Douglas later observed, the ‘1 Court specifically reserved the question whether the Georgia decree would be entitled to full faith and credit as a final discharge of the duty to support had the father been domiciled in South Carolina. 290 U. S. p. 213.” (Magnolia Petroleum Co. v. Hunt, 320 U. S. 430, 449.)
The Supreme Court severely undermined Yarborough’s rigid support doctrine by disregarding stronger contacts of the original rendering* State (Wisconsin) in permitting Ohio in a habeas corpus proceeding to transfer custody from father to mother contrary to a prior custody decree by Wisconsin where the father had been domiciled and the child domiciled with him at the time of the first decree. (May v. Anderson, 345 U. S. 528 [1953].) Justices Jackson and Reed, dissenting in May v. *769 Anderson (p. 538), point out that Yarborough seems to be undermined: “ If ever domicile of the children plus that of one spouse is sufficient to support a custody decree binding all interested parties, it should be in this case. Of. Yarborough v. Yarborough, 290 U. S. 202, 210. ’ ’ But Mr. Justice Frankfurter, concurring with four other Justices in May, held in language which indicates a serious reconsideration seems likely in the next full faith and credit application as to an issue involving support (p. 536): “ But the child’s welfare in a custody ease has such a claim upon the State that its responsibility is obviously not to be foreclosed by a prior adjudication reflecting another State’s discharge of its responsibility at another time. Reliance on opinions regarding out-of-State adjudications of property rights, personal claims or the marital status is bound to confuse analysis when a claim to the custody of children before the courts of one State is based on an award previously made by another State. Whatever light may be had from such opinions, they cannot give conclusive answers.” Having so decided one year after Langerman (supra) had been announced by the Court of Appeals, the Supreme Court in May v. Anderson (supra) fortified that ruling. (Cf. Matter of Lewis v. Lewis, 5 A D 2d 674 [1957], app. dsmd. 4 N Y 2d 872.)
Similarly, in a 1962 child custody dispute, full faith and credit was unanimously held by the Supreme Court not applicable to the second State (South Carolina) because of the Supreme Court’s own interpretation of the law of the first rendering State (Virginia). (Ford v. Ford, 371 U. S. 187 [1962].) The comment in Note, Ford v. Ford: Full Faith and Credit to Child Custody Decrees? (73 Yale L. J. 134, 137-138, supra) is particularly applicable to support problems as well: “Although the Court acted within its power in reinterpreting the law of one state to relieve another state of a putative obligation to honor the first state’s decree, and to relieve itself of the necessity to decide a difficult question of federal law, the reinterpretation which enabled it to do so may be questioned. Virginia cases, construing the effect of 1 dismissed agreed ’ orders in a variety of situations, hold uniformly that such judgments are res judicata. These cases were distinguished by the Court in Ford on the ground that they 1 involved purely private controversies which private litigants can settle, and none involved the custody of children where the public interest is strong.’ (Ford v. Ford, 371 U. S. 187, 192). The Court then cited Virginia cases to the effect that in child custody awards the best interests of the child, as contrasted to the wishes of the parents, must be the primary consideration. In view of this overriding policy, the Court *770 reasoned, Virginia courts would not regard as final this ‘ dismissed agreed ’ judgment, in which the trial court investigated neither the interests of the children nor the terms of the agreement. Ford, 371 U. S. at 192-193.”
The consent decree of the Mexican court in the case at bar is based entirely on the separation agreement of the parties. The evidence was expressed before me that no testimony or inquiry whatsoever took place before the Chihuahua court as to the needs of the child for support in New York City where he and the parents have always been domiciled, nor as to the means of the father.
The facts here are plain, and I so find, that the respondent father on the basis of equity, now as at the time of the 1963 Mexican divorce, could afford and should in justice pay $45 biweekly for the support of his child (50% more than $15 weekly as agreed and decreed by consent in Mexico). This father now, and at all material times in the past earned $169 net biweekly as a postal employee. While he has some outstanding debts, his creditors cannot garnishee his Government salary; his child’s needs come first. (Cf. Personal Property Law, § 49-b, and the civil jail sanctions available to compel support of dependents.) His present wife earns more than $4,000 net annually as a school teacher, so that his remarriage after the Mexican divorce was not only subject to his obligations to be decided by the courts of the child’s constant domicile (New York)", but also his wife’s self-supporting capacity does not diminish the means or capacity of the father to support his child. This child’s mother receives a total income of $36 weekly in social security benefits, but expends $25 weekly for her own necessary psychiatric treatment. The evidence before me further shows, and I so find, that, although the mother was of sound mind in the technical sense when she signed the separation agreement, she was then an in-patient at a mental hospital. No such information Avas before the Chihuahua court. The respondent father alone appeared in the Chihuahua court; the mother was represented by a local attorney there, as usual, and her separation agreement was adopted without inquiry by the Chihuahua court in its decree. The father had spent a Aveek only in the Mexican district.
Despite the insubstantiality of the contacts of the State of Chihuahua and the Republic of Mexico with these parties, this entire opinion must be predicated upon the validity of-the decree of divorce. A bilateral Chihuahua divorce decree based on as little as a one-day stay in Mexico by the plaintiff, where a certificate of residence is obtained and the plaintiff appears physically in a Chihuahua court and the defendant appears by *771 an attorney, is valid as between the parties (Heine v. Heine, 20 Misc 2d 409, mod. 10 A D 2d 864, amd. 10 A D 2d 967, new trial upholding validity of divorce, 231 N. Y. S. 2d 239, affd. 19 A D 2d 695) and as against the subsequent spouse of one of the divorced parties (Laff v. Laff, 5 Misc 2d 554, affd. 4 A D 2d 874, mot. for lv. to app. den. 4 A D 2d 959; but, cf. Wood v. Wood, 41 Misc 2d 95, 112). No claim is made by the ex-wife (petitioner) here that the divorce itself was invalid, for example on the ground that she was perhaps not represented in Mexico by counsel of her own choosing. (See Ploscowe, Mexican Divorces —When Are They Valid!, 36 N. Y. Bar J. 201, 205-206, June 1964; N. Y. L. J., Sept. 13, 1963, editorial page.) Indeed, even the child support aspects of this Mexican decree are quite valid until superseded by this order of the Family Court of the State of New York, and no retroactive provisions are made herein.
While the valid decrees of the courts of foreign countries are not entitled to the constitutional “Full Faith and Credit” (U. S. Const., art. IV, § 1) which each State must give “ to the public Acts, Records, and Judicial Proceedings of every other State ”, surely the comity due to the decrees of foreign courts gives them no greater application in the State of New York. (Cf. Rosenbaum v. Rosenbaum, 309 N. Y. 371, 376 and cases there cited.) The Family Court Act (§ 461) makes no distinction whatsoever between courts of other jurisdictions of the Union and courts of jurisdictions beyond the frontiers of these United States, referring to all courts other than the Family Court and the Supreme Court of New York by the clause: “ of another court of competent jurisdiction ”.
The Langerman {supra) doctrine indicated the extent to which the Court of Appeals regards this court as free to modify the child support provisions of a Nevada matrimonial decree even when no conventional change of circumstances is alleged. While it is true that ‘“a change in circumstances ’ will readily be found by a court interested in modifying a decree ”* (Note, Ford v. Ford: Full Faith and Credit to Child Custody Decrees ! 73 Yale L. J. 134,143 [1963]; Note, The Changed Circumstances *772 Rule in Child Custody Modification Proceedings, 47 NW U. L. Rev. 543 [1952]) an additional and independent extension should expressly enlarge the so-called 11 changed circumstance ” rule to follow the meaning of Langerman (supra) and indeed to do justice to children so situated.
Just as in Langerman the Court of Appeals showed the way, so in a later case the Appellate Division of the Supreme Court of New York in the Second Department conceded the possibility of a new frontier in the meaning of changed circumstances, albeit only arguendo. In Matter of Lewis v. Lewis (5 A D 2d 674 [1957], mot. for lv. to app. den. 4 N Y 2d 872, supra) the Nassau County Children’s Court order doubling $150 monthly support for two infant children embodied in an Alabama decree of divorce, was reversed with the observation that there was no showing of conventional change of conditions. The court there stated (5 A D 2d 675-676): “ Assuming, arguendo, that the Children’s Court, in the interest and welfare of the children and without proof that they were delinquent, neglected, abandoned or likely to become a public charge and without proof that there had been a change of circumstances since the entry of the foreign decree, had power to order the father to pay for the support of the children in excess of the amounts provided for in the divorce decree, nonetheless the amounts provided for in the decree were not so small in comparison with the father’s income and reasonable needs and expenses and the mother’s circumstances as to render it inequitable to permit the father to rely upon the terms of the divorce decree (see Matter of Bobinski v. Bobinski [285 App. Div. 836]).” I understand Langerman (supra) and Lewis (supra) to mean that if inequity is found in a child support aspect of a matrimonial decree, the Family Court can modify the extra-State decree child support provisions on the basis of a hearing de novo, substantially untrammeled by the extra-State matrimonial decree, to determine and order what is equitable for the support of the child.
Section 461 of the Family Court Act (supra) has meanwhile intervened to incorporate in the statute the judicial doctrine as to the need for “ the ground that changed circumstances requires such modification ’ ’.
How do all of these labored adjustments of the courts resolve themselves? Taking all these mandates, policies, indications and developments, including those of constitutional, legislative and judicial origin, the essence seems to come to this, that a matrimonial litigation, particularly an uncontested one, or one settled during its course by consent decree, or by ‘ ‘ dismissed agreed ’ ’ decree, cannot by its incidental provision of support *773 for a child, control a subsequent court where the child’s interests are first separately litigated by parents unincumbered by their own personal purpose to win their freedom, or even a separation, from what appears to them to be a hopeless marriage. No parent should be able to bind a child by buying matrimonial freedom at the price of selling a child’s material or other security, even if a court approves such agreement. As soon as the parent’s marital freedom is adjudicated, the parent’s “ circumstances ” thereby ipso facto are changed by the new freedom itself. Having been safely separated, divorced or the marriage annulled, the parent for the first time is in a radically “ changed ” position — to litigate freely, to strive vigorously for an equitable order of support without fear of refusal by the other parent to co-operate in the separation, divorce or annulment by consenting to appear, or by declining to controvert the proof. Here in the Family Court, the Judge is for the first time given both sides of the circumstances as contended for by the respective parents, and he can find the facts as they are rather than as a separation agreement and mute parents made them appear to another court.
What is said here about change of circumstances between the rendering of an out-of-State matrimonial decree incidentally providing for support of a minor child and a subsequent adversary litigation concerning the child’s support as such, applies as well to two such differing hearings within the same State. There are cases which appear to take a contrary view, but there is hope that as the law continues to develop, the mandate of res judicata will apply only after the inequity which may lurk in any “ incidental ” adjudication as to child support, is corrected by a head-on contest in which only the interests of the child are at issue. No child support decree should be sacrosanct if “ incidental ” to, and inequitably incidental to, the problems of adults.
For all of the above reasons, I have ordered the father to pay $45 biweekly for the separate support of his child, instead of $15 weekly as provided in the Mexican consent decree of divorce, which consent decree I find to be substantially inequitable and inadequate in respect to the support of this child, under all the circumstances. The operative change of circumstances since the Mexican decree is merely in the mind of the mother to litigate freely for the first time on behalf of the child, untrammeled and unfettered by her personal matrimonial problems.

 Instead of proceeding expressly upon the new path intimated in Langerman (supra) the Domestic Relations Court shortly after the Court of Appeals ruling therein, in entertaining a petition for modification of the Nevada support provisions, trebled the support for each child (from $25 to $75 per week) on the conventional and seemingly inadequate ground for so thoroughgoing a change, that the children had become of school age (203 Misc. 230). Surely, the unspoken basis for so complete a re-examination and so excellent a result was the Langerman theory that a Nevada child support provision based upon a consent decree was not a limiting factor in any real sense.